Mr. Beck? Thank you. May it please the court, my name is Timothy Beck from the Duke-Francisco Bateman firm, representing the Plaintiff and Appellant Judy Moran. As the court knows, this comes, this matter comes before the court after a motion for summary judgment, actually the first motion for summary judgment was filed in this employment action. It is the Plaintiff's contention, I think it's as a matter of law, that the severance and general release agreement that was served upon this Plaintiff during the course of her employment which conditioned the retention of her civil rights, predicated her retention of the civil rights and the release to her employer, respectively, violates the New Jersey law against discrimination in jurisprudence both at the United States Supreme Court level as well as the New Jersey Supreme Court level. Can I ask you a question? Certainly. What's left here? The client's been paid full severance, right? There's no question about the salary being paid, that's I guess you have a beef about the stock options, right? Yes. Is there anything else? Sure, retaliation. What can you get there? Whatever jury gets. I think that a jury would be rather put off by an employer withholding six months worth of wages under the guise that it has to be under 409A when the release agreement itself says that she forfeits her... So, Mr. Beck, you have two claims remaining, the retaliation claim and the stock option claim? That's correct. That's all that you've got left in this case? I thought you might walk us through, in respect to your retaliation claim, what conduct on the part of the defendant in this case is The first one is the mere issuance of the general release agreement. The general release agreement issued upon my client, upon Ms. Moran, in June of 2006, basically said in order for you to obtain severance, which was already provided to her under her existing employment agreement, that she has to execute a release of all the claims under the New Jersey law against discrimination, federal statutes, everything else in order to be able to preserve her rights under the discrimination statutes. You have to remember that at the time that this arose, Ms. Moran's company had just been bought out by DeVita. DeVita came in in October of 2005. Prior to that time, it was Ms. Moran's view that Gambro, the predecessor, had always been... I don't follow how that was retaliatory, however, because that was the first thing that happened, was the issuance of this release. How was that retaliatory? Well, because it retaliates facially against any individual who seeks to retain her rights to pursue a claim. That is handing over a piece of paper? Well, it wasn't just handing over a piece of paper. It was handing over a piece of paper that said, your failure to execute this document will cause you to forfeit your severance that you were guaranteed under your existing employment agreement. Well, that's just stating what you have to do in order to get the money, but how is that retaliatory? It's in retaliation for what? For refusing to relinquish your civil rights. What you have in New Jersey and in the federal... But that's what they were asking her to do, but you're saying that was retaliatory. That's what they were asking her to do in the statement itself. What was it asking her to do? It was compelling her to do it. Okay. Well, there is a significant difference between... I understand that too. The statement says, in order for you to get paid, in order for you to get health benefits, you must give up certain rights. I understand that. Well, you must give up all your rights. All your rights. Whatever the document says, but what you're saying is that document is in retaliation. It should be in retaliation for something else. It is. Well, it's retaliation for preserving your rights. Let's look at this the way it is in the real world, is that women face discrimination all the time. There's no gender... Gender's not even in the case anymore, is it? Well, no, because it was assumed by retaliation. What you have is... Suppose that there's a scenario where you have the glass ceiling, which is what Ms. Moran thought might be happening here. Typically, what you have is you have conduct that a female observes during the course of her employment that she believes creates a double standard, that the men are treated one way, the women are treated the other. What the New Jersey Law Against Discrimination does is prohibits that type of glass ceiling. But a glass ceiling is just what it is. It's not observable very easily to people on the outside and sometimes not even to the women on the inside. That's why the New Jersey Law Against Discrimination has a two-year statute of limitations. When you have a glass ceiling, things that occur afterwards or in the context of a period of time are what will allow you to evaluate whether or not you've been subjected to the glass ceiling. You will see other women being discharged. You will see, even after you're discharged, if you find out that what has happened is your employer has subsequently gotten rid of a number of other female managers and replaced them, what that allows a person to do is to evaluate whether or not she has been part of... Subjected to discrimination. There's a two-year statute of limitations for that. And for good reason, because that is what allows the employee to determine whether or not her belief is supported factually. What this severance agreement did is fire the first salvo and say, basically, we are requiring you now to relinquish any rights. You do not have two years to evaluate and assess your situation. You do not have... I'm afraid I'm still having difficulty finding out what that is retaliatory for, or in what sense. That is to say, the simple delivery to the plaintiff of this curious document. If I were the plaintiff, I certainly would have gotten ahold of a lawyer at that point that says, look what they're trying to tell me. But nothing happened. Well, nothing happened. She lost her wages for six months. She lost her benefits. She lost her insurance. But that goes beyond the head and shoulder of the release. There's not retaliation, I take it, until one or another of these... arguable retaliation, until one or another of these losses takes place. The delay in the severance benefits, and so forth. Before you actually get to that operative... No, I disagree, and here's why. If you look at her employment agreement, there was not supposed to be a holdback of any kind of a notice period wages. That only comes by operation of this general release agreement that served upon her. What I think the court has to appreciate is that it wasn't just served upon her, it was implemented. Under her employment agreement, she was supposed to have the benefits, as the district court found. She was supposed to have her benefits during the entire period of the notice period. In addition to this document, and Judge Pollack mentioned a few things, there were other things that you claim were retaliatory. Well, certainly. We can move from the document to those other events. Well, the most obvious one is the seizure of the severance payments that had been made in January of 2007. There is a purported six-month waiting period for... When you say seizure, you mean... Reversal. The reversal of the funds and taking them out of her bank account after they had been delivered. Well, for the first instance, they weren't paid. Is that right? Did you not claim it for not paying or withholding the payment? No, it was retaliation because at that point this matter was in suit. What had happened is that Ms. Moran, because she felt that this general release agreement was going to affect her, she had to go without wages. I may have a misunderstanding of some of the events in the record, but I thought that you also said they didn't pay her. She had a right to notice payment for a six-month period. Yes. And they didn't pay her. That's correct. They did not. And I thought that your argument was that, in addition to other things, was in retaliation for her not signing the document. Well, that's correct. What the employer did was hold back six months' worth of her notice period wages at the same time that there is a non-compete clause. So she cannot get work elsewhere, and she has her pay withheld. Yes, but isn't that pursuant to their, I mean, it could be a mistaken belief that section 409A compelled that? But it was not a mistaken belief. If you have to draw the inferences in favor of a plaintiff, as the Court must, what you had was in August of 2006 a communication from Mr. Sheppard in Chicago to Mr. Cooper, the DeVita's attorney, that said that those two individuals, Oldfield and Burley, were not subject to 409A, and they had greater salaries than Ms. Moran. Now, Ms. Moran had already communicated to DeVita that 409A should not have applied to her. She should not be going without her wages for six months. But mistakes don't constitute discrimination. I mean, if it's a true error on their part. But the inference is that there is no error. If 409A requires, or there's a safe harbor, and I know I'm running out of time here, but the safe harbor provision basically said that 409A will not apply to severance agreements if the aggregate severance payments are less than two times the lesser of the qualified plan limit. This is an actual calculation in 409A that tells you whether or not the employee is subject to it. What DeVita found out in August of 2006 was that both Oldfield and Burley were not subject to it, and therefore they eliminated it from their plan. Allowed them to be paid without any interruption while Ms. Moran's wages were still being withheld. Six months is a long time to go without your wages. But wouldn't it make a business decision that even if we're wrong, they signed the release and we're not going to be liable, so be it, type thing? They signed a release that doesn't mention 409A at all. What it does is it has the same release requirements that were served upon Ms. Moran. In other words, this has become company policy that either you give up your rights and relinquish them now, or you don't get your severance. That is illegal. You cannot predicate the receipt of contractually guaranteed remuneration based on... They claim that that's not the case. We can argue about the language, but at some point you learned that the two were not connected, right? When did you learn that? In other words, she wasn't going to get what was in the contract. She wouldn't get the enhanced package because she wouldn't sign the release, but when did you learn that, in fact, the release, that whole agreement had really nothing to do with the contract? Well, we have to learn that because there has to be an explanation as concerning the reversal of the funds, the severance payments that were made to her. If DeVita was not relying upon 409A, which it surely cannot because now this payment was made after the six-month holdback period, that when they go into her bank account and take that money back out, that it has to be not based upon 409A, but some other thing. It either has to be because she had not agreed to relinquish her rights or she had filed a suit. So you're suggesting that they paid her a certain sum and then electronically reversed the payment in retaliation? Yes, because there's no other explanation. But it sounds like we decided we're going to pay you X number of dollars. How much was it? $95,000. So we're going to pay you $95,000, but then we're going to reverse it because we want to retaliate. That's the inference that you would... Yes. It has to be. There's no other explanation for it. Okay. And the reversal occurred how many days after the payment? Well, it was within 10. What had happened is that... Well, I can understand how it could wreak havoc on somebody's checking account, right? Well, I guess it's maybe a question of time. I don't know. Your red light is on. I'm sorry. We'll get you back. Do you have how many minutes? Four minutes. Four minutes is fine. Maybe you can address that stop option issue. Sir. Mr. Adler. May it please the court. My name is Matthew Adler. I represent WB Incorporated and Mr. Javier Rodriguez. Your Honor, Mr. Beck started out by saying, characterizing this as an employment action. And as the district court found, this started as a contract case, and I suggest it remains at the end of the day, a contract case. It's a contract case in which the employer performed by paying the employee every penny that was due for the notice pay and for the severance pay. She had a six-month period, a notice period. She did, Your Honor. Either party can exercise the right to terminate the employment. Yes, Your Honor. And she was notified on May 2nd that her services were no longer desired. Is that correct? She was notified on May 2nd and then... So that she would have six months, and in that six months she would be paid her normal salary. Well, that was the plaintiff's contention. I want to answer the court's question. I thought I was pretty much just restating what the contract said. What the contract said was that she would be entitled to notice pay. What Judge Pisano determined, and what the penalty has not appealed, is that the payment of that notice pay, not from that six-month period, but in fact beginning six months later in January 2007, was a reasonable interpretation of the timing provisions in the employment contract. Wasn't she entitled to pay from the day of the notice of May 2nd for a six-month period? I want to answer the court's question precisely. Yes, she was entitled to that pay. Yes, she got that pay. But as a matter of interpretation of the contract, when that notice pay commenced was determined by the district court to be reasonable, and that's not an appeal. When did it commence? It commenced, Your Honor. I refer the court for almost all of the questions that the court asked in my plaintiff's presentation. The media's records show that it commenced on December 30th, 2006. There's a distinct record of all of the payments, and I've referred to it several times, on pages A457 and A458 of the appendix. I have one more question. When did she stop working? What was her last employment day? June 18th, 2006. June 18th. Okay. I think Judge Polley has a question. No. Oh, no. Okay. Sorry. Just to finish, can I ask you, what did she find out? I mean, the language, there was an issue about the language, whether the language in release says you can't get anything until you sign this. When did she learn otherwise? When did you advise them otherwise, that we will be entitled to the severance pay that is set forth in the employment contract? Your Honor, it was two different verbs, and I want to respond to each of them. In point of fact, the record will show that there was no specific advice along the lines of what Your Honor just said. But what did she learn? Again, page A457, she learned on December 30th, 2006, as money started flowing into her account. She said, no, I'm not going to What she did get, what Judge Pizzanella determined that she got, and what he was obligated to deliver, was her original notice and severance benefits under the employment agreement. She was entitled to two different types of payment under that agreement, right? The severance pay as well as the notice pay? And got every penny. Well, got every penny. The argument is that you didn't give it to me when I was supposed to get it. Your Honor, this is what I would like the court to give its opinion. The court's quite right, I'm not disputing that. The court is saying there was a six-month delay in provision of the notice payment. Below, the appellant sued for breach of the contract. Breach of contract, not retaliation. Breach of contract on that basis. And Judge Pizzanella determined, and this is page 826, 827 of the district court's opinion, quote, because the contract is silent as to the time obligations for Moran's notice pay, this court declines to confer a specific, as opposed to a reasonable, time obligation where one does not exist. And that's now a matter of record. That's not appealed. There is no appeal here of the contract determination. So the court's quite right, but it's just not actionable anymore today if it once was. Your point is that she got all that she was entitled to. She got all that she was entitled to. It's a contract case. She was entitled to with respect to the stock option. I can turn next to that, Your Honor, and the short answer is yes, she did. So moving from notice of severance, which is the last question, to terms of stock options, she did. The stock, if I can just frame it contractually, the stock options emanate from a different agreement. Not the agreement that DeVita inherited, but rather now one that Ms. Moran made when she visited DeVita in Hawaii. And the stock option provides, quite plainly, for certain vesting requirements. And what it says is that for somebody who is employed for less than three years, and this is in section three of the agreement, that the options must be exercised within three months of the termination. Employed for less than three years? Yes, Your Honor. Is she following that? Employed by DeVita for less than three years, so yes. Because, again, it's a different contract. Did DeVita carry over the employment from prior years? It did not, Your Honor. As a matter of fact, the employment agreement provides, and now back to the first one. I don't mean to confuse the court. The employment agreement, when speaking of benefits, provides specifically that you get the benefits as set forth in Annie Whiting's detail in the benefits program. So the employment agreement, the original agreement, would incorporate the stock agreement, the later one. And that later one says, and now I'll turn to answering Judge Proctor's question, there are two reasons why she does not get the stock benefits. The first is that under the plain terms of Section 3E2 of the stock agreement, the stock would have to be, the options would have to be exercised within three months of termination. And as Judge Pisano determined, it was unfortunate but true, and I think he used the word unfortunate it was, that she simply did not do that. So you have a simple lack of a condition precedent for the exercise. What's the start date for the three-month period? It would be June 18th, which is the last day that she exercised. But if, but if, and now we get to the second reason, if for some reason someone were to say, well, no, no, maybe it's not June 18th. Yeah, maybe it's November 2nd. Maybe it is, Your Honor, but that would be a new argument on this appeal. The plaintiff always used June 18th and always accepted June 18th. It's June 16th. Excuse me, Your Honor? Just say June 16th. I stand corrected. Okay. So thank the court. But under the employment agreement, it's supposed to be May 2nd, isn't it? In other words, she had six months from the time that she's terminated by memo of May 2nd. She's entitled to be an employee for a six-month period. She's not terminated for a period of six months. That would be November 2nd. Well, two points. Still in response to Judge Boggs' question, because I don't know who's the point. No, you can announce it, Judge Boggs. It's our contention that the first of the two reasons that the stock option claim is not alive is because of the plain language that I've stated. If you date it from June 18th to 16th. But regardless, regardless of what date you might pick, and I take the court's point, let's say instead we date it from November 2nd, there is still, the record is completely silent as to any attempt to exercise the options at any point. So wherever we say X is, and then you have to exercise it from three months after X, she never did that. That causes two problems. And Judge Pisano addressed both of them and was correct on both. It causes a condition precedent issue because you simply don't vest those in the time you need to. But it also causes a valuation issue. And Judge Pisano has expressed on this in the opinion. Because what he said is, if she never attempted to exercise the options, well, then how can we possibly value them? There's no date on which we can value them. And what the plaintiff says here is we're now going to pick October 31st, citing this court's decision in the Scully case, as the date on which we should pick. That's totally arbitrary. In Scully, there was the plaintiff saying, I now want to exercise. That didn't happen here. The employer denying the attempt to exercise, that didn't happen here. And a specific date on which you can measure it, that didn't happen here. And so for reasons both of the lack of vesting and the absence of an evaluation date, no, no stock is on. Either day, either whether it's June 16th or November 2nd. Or November 2nd or nothing. We flip a Christmas date or any other date. I mean, we're never going to exercise an option by just going and saying, just picking up a check, really, don't you? I mean, you make a declaration that I want to exercise my option. I mean, you need an affirmative, I want my options exercised. We'll exercise my options. I think that's correct, Your Honor. Whatever affirmative statement one might need, the record is absolutely silent. The court won't say anything. The court won't say anything. He's very thick into it. It did not happen. Did the plaintiff ever say in argument or in the district court that the November 2nd date should be the operative date? The operative date for what? For the stock option exercise. The plaintiff may have said that at one point. The record reflects that, here it is, excuse me, appendix page 850. And we summarize this in our group for pages 4 and 4.1. The plaintiffs invariably picked September 23rd, 2008, November 1st, 2007, and October 31st, 2006. The specificity was made clear, I think, only in the reply brief on the subpoena. There were many, many dates before today. Do you remember Judge Pollack's question? I believe the question. I'm not nearly as good as Judge Pollack. I hope I answered it, Judge Pollack. But the question was, what about her stock? And did she do it? And the answer is no, for reasons of non-vesting and lack of valuation, as the district court determined. If I have any time left, or if the court has questions, I think we can respond. Are you responding to the retaliation issue? Well, let's break it into parts, if I may. I think the court has really shown that it's already in mind of the response to the three instances of retaliation. It can't be retaliation to serve the 7th Circuit. Don't be deceived by our sympathetic questions. I've learned that a long time ago, Judge. No, I've got to see this. Let me address it in great detail, or whatever detail I've got. Two points. As to the service of the 7th Circuit, and as to the imposition of the six-month delay, that can't be retaliation because it happened before Ms. Moran expressed anything. So even if Ms. Moran had engaged in protective activity, which I think is highly dubious on this record, this wasn't a response. It wasn't a cause. It happened before. Judge Pisano has expressed on that. He said a plaintiff cannot establish a retaliation claim based on a protected activity that occurs after an adverse employment action. So that just wasn't there. And on top of that, it was an enhanced agreement. The media offered more in the 7th Circuit. Ms. Moran said, no. Frankly, she probably called the leaders bluff. She said, no, I'm not signing this. And what happened? What happened was $276,000 in payments for 18 months of service. What gives me pause is the fact that when a Ducati employee gets this agreement, leaves it and says, hey, gee, if I don't sign this thing, I'm going to die. Now, what happens at this point, if it's pretty sharp and got a lawyer to help parse it through this, but what about the next person who just says, I had to sign it. I needed the money? The question becomes, what is the action based on that? And if she had not paid it, had not signed it, excuse me, and the media didn't pay, well, then we have a breach of contract action. But the answer to the court's question is not a retaliation claim. Maybe it's a statutory remedy at some point, but it's not a retaliation claim. And as the court said at the beginning of my opponent's comments, it can't any longer be an employment action because the discrimination claims are gone. What about withholding her notice pay and withholding her lump sum payment, I guess, or the severance pay? I think it's extremely difficult to find, well, two answers. First of all, I'm sorry to cut you off, not only withholding it, but Mr. Beck was arguing that the reviving the funds also was done purposefully in retaliation. The anomaly that's presented by this case is that the court is asked to find a retaliation claim after the district court determined that the timing of the payments is not a breach of contract and the appellant has an appeal of that determination. So the anomaly this court would be presented with, and frankly, the plaintiff is asking this court to accept, is that somehow the payment terms are just fine under the contract, the payment time and the sequencing of the defendant's performance. It's just fine under the contract that there's been a factual determination that after an extensive summary judgment brief, but we're somehow going to hold that that's retaliatory. DeVita withheld a 409-type payment to several people, including Mr. Oldfield. It then sent him a letter and said, you know, our determination of 409 is in error. We should give you your money, and went ahead and paid him once he signed some kind of release, but did not do so for Ms. Moran. The treatment is perfectly consistent. Even if discrimination was present in the case, the answer to the court's question came in the court's phrase, once he signed some kind of release. What DeVita did with the two males is exactly what he did with Ms. Moran. It said one thing or the other, either sign a release and get the money now or don't sign a release at all. But the problem is the release that she was being asked to sign was a waiver of all claims that she could have, of all types of suits that she could have against DeVita, which really was not required by her employment contract. Her employment contract had nothing, it said nothing about signing a statement to get paid. Her employment contract also said nothing about investment in retirement benefits, payment of COBRA payments. It was saying her salary would be higher. I think that's her point, and I think Mr. Beck's point, is that you were asking her to sign something that she did not have to sign. Ultimately, it was determined that, indeed, she didn't have to sign. Ultimately, if she didn't sign it and DeVita had not paid $276,000, I'd be standing up here defending a breach of contract action. That's not what happened. DeVita paid. Thank you. Thank you for your arguments, Mr. Adler. Mr. Beck. Yes, thank you. Yes, don't be deceived by those questions. That's all right. I can paraphrase Judge Pollack. One thing I want to emphasize is about the reversal of the payments because that is a distinct retaliatory action. Once DeVita gets outside the 409A window, that six-month excuse period where they can hold up somebody's payments for six months, and it is now last, they make a payment, and there's communication between Mr. Cooper and litigation counsel about what they should do. Can we follow the chronology? Certainly. The payments were made and the payments were reverted, however it's done on a trial basis. Yes, I can give you the whole thing. And then they were paid again. What happened? No, they weren't paid again. At some point they were. Well, what did happen? I'll go through this very quickly because it is all in the papers. What had happened is that on June 13th, Ms. Moran had sent a memorandum to the human resources people at DeVita saying, among other things, how do I exercise my stock option or what do I do with ABCD? It's all in there. On June 16th, three days after that memo was given, she gets this general release agreement that, among other things, instead of having November 2nd as her separation date, moves it to June 16th, which will disqualify her from the stock option. It also says that you're going to not get your notice period wages for a period of time for whatever reason, whether it's 409A or not. So for six months, Ms. Moran is not getting any kind of remuneration whatsoever, has her benefits discontinued, and has no insurance. In the meantime, DeVita is also demanding that Ms. Moran honor her non-compete. They've actually filed a declaratory judgment action on December 1st in this court to prevent Ms. Moran from getting any type of employment. And then on January 5th, they make the lump sum payment for the six-month deferral without any notice. We don't know what it is. In the record, I write to litigation counsel and say, she just got $45,000 in her account. What is this based upon? How are the calculations made? We don't even know what this payment is for. Within that afternoon, there's communication between litigation counsel and Mr. Cooper. You see that in the testimony. That then instructs the people out in Washington to reverse that payment. How is that retaliatory? It seems like it was a mistake. A mistake? But for what? She has to be paid the severance. If the whole idea, if DeVita's argument is that we could not pay her for six months because of Internal Revenue Service provisions, 409A, otherwise we would have gladly paid her severance, then what excuse do they have after 409A has lapsed? The only thing is, you have not signed that release. You still have not signed that release. Oldfield signed it, he got his payments. Burley signed it, he got his payments. You haven't signed it, we're reversing those. This is the shot across the bow. We need it. We want you to relinquish those rights or you're not getting paid. Now that is what the reasonable employee is going to feel, is that if I don't execute this, they have actually gone into my bank account and reversed that which they have paid, supposedly based upon that six-month holdback period. That has now expired. This is the shot across the bow. You haven't signed the release, you're not getting paid. Is Mr. Adler correct that Ms. Moran never sought to exercise her stock options? No, not at all. If you look at the June 13th memorandum to Human Resources, remember this is three days before she gets the general release, what she says is, can you advise me how to exercise my October 2006 stock option? And then what she gets after that, three days later, is the general release that sets her separation date as June 16th instead of November 2nd that disqualifies her from being able to exercise the stock option. What they've done is— You agree that we should look at that date as her termination date? November 2nd? No, June 16th. No, not at all. That's an arbitrary date designed to basically divest her of all the things that she was entitled to as an employee. That's when they discontinue her insurance. They discontinue her benefits. No more 401K, nothing. That is inconsistent with her employment agreement with Gambler. But starting now, why couldn't they pick June 16th? I understand the fact of it, but why shouldn't they pick it? Well, because under her employment agreement, what it says is your employment will expire six months after you are served your notice. Your employment. So on May 2nd, she gets her notice. That would mean that her employment and her status as an employee will cease on November 2nd. But doesn't it also say it can be done at any time? No, it says your duties, your employment duties, may be discontinued. And what that means is that if—suppose the employer says, look, we gave you your six-month notice, but frankly, we don't want you signing documents on our behalf. We think there may be divided loyalties, there may be animosity. We are going to deauthorize you from exercising your employment duties. You don't even have to go into work, if that's what I, the employer, say. You still get six months' worth of pay. You still get six months' worth of pay and your status as an employee remains for six months. But that is not what DeVita did in this case. They stripped her of everything and demanded that she relinquish any rights that she had to preserve her LAD claims. And that's the whole thing, is that even just—it didn't mean that she had to make them. It's what it said, is in order to get your severance, you have to relinquish it now, prospectively. You don't get the two years, you don't get to see whether we fire every other woman in management. You give it to us now or you're not getting paid. I thought the district court had used that June 16th date as the termination date in assessing the stop-option issue. Well, that's true. And that you did not dispute that? No, that's incorrect. Did you, in fact— Yes, I did. Yes, if you look at—yes, because November 2nd is the end of her employment. It would be our position that the June 16th date—and it was raised below and it's raised here. The June 16th date was arbitrary, decided by DeVita, and it had a number of effects, one of which was to make it so that she did not qualify as an employee on November— When did the six-month period commence? May 6th. Well, now, what about when she's told verbally? Now, if you look at our employment agreement, it has to be in writing. Because remember that Ms. Moran is also going to be tied to DeVita for that six-month period, that she doesn't get to just get up and walk out and leave them high and dry. Both parties had the obligation to provide six months' written notice, and what happened was in March of 2006, Mr. Rodriguez, Defendant Rodriguez, said, we don't see him continuing here, but he's not going to issue his written notice yet because he needed her to attend meetings. She had to go to the national conference in April. There were other things that she had to do. And it was only in May that he issues the notice, the official notice, and it is so termed. I mean, the notice itself that he issued says, this serves as your notice. Your employment will expire on October, or whatever it was, which was not correct. It was premature. It was supposed to be November 2nd. Okay, that's it. Thank you very much. Thank you, Mr. Baird. Mr. Adler, thank you. Thank you, Your Honor. I think your arguments were very helpful. We'll take the case under advisement. Thank you very much.